UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHUKWUEMEKA NDULUE, M.D, <br><br>Plaintiff, <br><br>v. <br><br>THE FREMONT-RIDEOUT HEALTH GROUP, <br><br>Defendant. | No. 2:14-cv-00735-KJM-EFB <br><br><br><br><br><br>ORDER |

     Plaintiff Dr. Ndulue sued the hospital where he works for allegedly retaliating against him and diverting patients to other doctors. Defendant hospital, the Fremont-Rideout Health Group, now moves for summary judgment. Mot., ECF No. 41. Plaintiff opposes. Opp'n, ECF No. 46. The court heard the motion on March 10, 2017. Anthony Madu and Darin Dominguez appeared for plaintiff; Preston Young and Glenn Holley appeared for defendant. Hr'g Mins., ECF No. 61. As discussed below, the court GRANTS defendant's motion.

/////
/////
/////
/////

1

I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

   A.  The Parties

   Plaintiff, a Nigerian pediatrician, immigrated to the United States twenty years ago and now operates a solo practice in California. Pl.'s Dep. vol. 1, 20:2–3, 21:24–25, 24:15–17, 36:1–6, Zim Decl., Ex. B, ECF No. 44-1. As a hospital staff member, plaintiff admits patients to defendant's facilities. *Id.* 24:18–25.

   B.  2011 Settlement Agreement

   This case is not the parties' first rendezvous. Plaintiff sued defendant in 2008 for racial discrimination and conspiracy to interfere with his business. 2008 Compl., *Ndulue v. Fremont-Rideout Health*, Case No. 2:08-cv-001696-WBS-KJM,[2] Zim Decl., Ex. C. The parties settled during trial before the jury returned a verdict. Civil Jury Trial Mins, April 28, 2011, Ex. F, ECF No. 44-1. As relevant here, defendant agreed to amend its "newborn patient allocation policy" to reflect that the hospital staff would "make reasonable efforts" to discern which pediatrician a laboring mother prefers and obtain that preference in writing. 2011 Settlement Agreement ¶ F, Ex. G, Zim. Decl.

   After settlement, defendant changed the pediatrician allocation form as agreed. *See* Krista Minton Dep. 23:12–16, Zim Decl., Ex. X; *see also* Pediatrician Request Form, Minton Decl., Ex. 8, attached to Minton Dep. Defendant now gives a laboring mother a list of pediatricians to select from when she arrives at the hospital, and nurses neither endorse nor oppose any options. Minton Dep. 26, 33–34.

   C.  Hospital's Alleged Diversion of Plaintiff's Patients

   Plaintiff claims defendant is violating the parties' 2011 settlement agreement and is again diverting his newborn patients to other pediatricians. Compl. ¶¶ 22–24, 27, ECF No. 1. The hospital's administrative records show no decline in the newborns the hospital assigned

---

[1] The court cites to the record rather than the parties' statements of fact. Unless stated otherwise, the background facts are not genuinely disputed and this section takes account of the court's resolution of the parties' objections below.

[2] The court grants defendant's request to judicially notice this complaint. Fed. R. Evid. 201(b); Ex. C, Request for Judicial Notice ("RJN"), ECF No. 45.

plaintiff during the years about which he complains, 2010 through 2015. *See* Patient Allocation Table, Christy Rhoades Decl., Ex. U to Zim Decl. The hospital's billing records show the number of patients plaintiff billed during these years was higher than any previous five-year interval in which he worked at this hospital. *See* Billing Record, Zim Decl., Ex. T. Plaintiff's own Schedule C forms showing the reported income on his 2010 through 2015 tax returns reveal his annual receipts and medical account deposits are virtually identical from 2010 through 2014, with an upward spike in 2015. *See* Schedule C, Zim Decl., Ex. V; *see also* Julie Shea[3] Dep. 23:2–24:8, Zim Decl., Ex. W (authenticating this document).

### D. Plaintiff's Letters

Besides the alleged newborn patient diversion, this suit also involves plaintiff's one-week suspension, which he claims amounted to unlawful retaliation. Defendant suspended plaintiff's hospital privileges temporarily after he wrote two letters criticizing the hospital's patient care standards.

#### 1. Plaintiff's First Letter

Plaintiff directed his first "patient care concern" letter to his colleague, Dr. Shahzad Naseem, and sent copies to hospital leadership. Pl.'s 1st Letter (dated June 6, 2012), Zim Decl., Ex. H; Pl.'s Dep. vol. 1, 171:13–14. This letter accused Dr. Naseem of "getting away with serial homicides," "supervis[ing] the death of yet another baby," conducting "murder and mayhem," having medical skills equivalent to the cleaning and security staff, and turning "the Pediatrics department into a lawless tribal region attempting to behead anyone who does not belong to [his] conspiracy of morons." Pl.'s 1st Letter; *see also* Pl.'s Dep. vol. 1, 170:8–20 (authenticating the letter).

Offended by the personal attacks, Dr. Naseem sent the letter to the hospital's Professional Review Committee ("Committee"), which reviews the staff's behavior and professionalism. *See* Brar Dep. 28:18–22, 68:10–17, Zim Decl., Ex. J. When the Committee receives behavioral complaints, it "rates" the alleged misconduct and then responds

---

[3] Julie Shea is plaintiff's Certified Public Accountant.

| | |
|---|---|
| 1 | proportionately.  Code of Conduct, Zim Decl., Ex. I; Brar Dep. 59:1–18, 60:1–22.  The |
| 2 | Committee here responded with two separate letters to plaintiff: The first addressed plaintiff's |
| 3 | patient care concerns; the second, sent weeks later, addressed the language plaintiff used in his |
| 4 | letter.  *See* Committee's 1st Letter (dated July 3, 2012), Zim Decl., Ex. K; Committee's 2nd |
| 5 | Letter (dated July 23, 2012), Zim. Decl., Ex. I.  The Committee's second letter declared plaintiff's |
| 6 | language inappropriate and contrary to the hospital's Code of Conduct and rated plaintiff's |
| 7 | misconduct as a level two out of three, meaning it was serious but not yet worthy of adverse |
| 8 | action.  The Committee also told plaintiff how to properly report future care concerns to the chief |
| 9 | medical officer.  Committee's 2nd Letter; Brar Dep. 59:13–22. |

### 2. Plaintiff's Second Letter

Plaintiff responded to the Committee's action with another scathing letter of his own, which he again characterizes as a "patient care concern" letter.  Pl.'s 2nd Letter (dated Aug. 22, 2012), Zim Decl., Ex. L.  This letter describes one hospital physician as "semi-literate with an infantile personality," accuses others of being morons, indicts the medical staff as "laughable and rigged," brands the Pediatrics Department a "lawless tribal region," and insists allegations against him were "based on well-rehearsed lies and planted stories designed by a group of conspirators."  *See id.* at 1–4; *see also* Pl.'s Dep. vol. 2, 227:6–21, Zim Decl., Ex. M.  Plaintiff also compares "dead and maimed babies" in certain hospital wards to serial homicides, recounting his exhaustion over "seeing broken babies walking through [his] office[,] [a]ll courtesy of our wonderful pediatricians"; he decries an incident where a baby in "shock" was allegedly pre-selected as a ruse while everyone "rehearsed for their parts in this charade" to get plaintiff bellowing.  Pl.'s 2nd Letter at 3.  Plaintiff acknowledges he knows where to send formal care complaints, yet he sent this letter to Committee member Dr. Brar, and not the chief medical officer.  *See id.* at 4.

/////
/////
/////
/////

4

### 3. Plaintiff's Suspension

After reviewing plaintiff's second letter, the Committee recommended that the Medical Executive Committee ("MEC")[4] suspend plaintiff from the hospital for seven days. The MEC accepted this recommendation, citing "the destructive nature of [plaintiff's] letters, their outrageous language, [plaintiff's] past history of sending such letters about colleagues and staff, and [plaintiff's] behavioral history." *See* Susp. Letter, Zim Decl., Ex. N; Brar Dep. 10:12–11:5; Plass Dep. 72:5–17, 73:18–74:3, Zim Decl., Ex. O; Brouette Dep. 56:3–21, 57:13–23, Zim Decl, Ex. P. The MEC's suspension letter reminded plaintiff that, as a member of the hospital's medical staff, he had agreed to understand the Code of Conduct and to abide by it. Susp. Letter; Pl.'s Dep. vol. 2, 221:4-14 (affirming his obligation to abide by the Code and his understanding of it). "Criticisms leveled at the recipient in such a way that it intimidates, threatens, undermines confidence, belittles, or implies stupidity or incompetence" violate the Code. Code § II.E.3. Under oath, plaintiff admitted he intended to criticize another staff member and convey that person's incompetence in his first letter. Pl.'s Dep. vol. 2, 219:12–25, 220:1–2.

The Committee invited plaintiff to meet with its members to discuss his behavior, and plaintiff did attend a meeting as offered. *See* Zim Decl., Ex. Q; Brouette Dep. 111:24–112:13; Pl.'s Dep. vol. 2, 294:12–295:4 (affirming the existence and substance of the meeting). Plaintiff then chose to serve his suspension in May 2013. Pl.'s Dep. vol. 2, 315:15–21.

### E. Plaintiff's Claims

In his complaint filed on March 20, 2014, plaintiff brings eight claims against defendant based on his suspension and the allegedly ongoing newborn patient diversion. His claims are:

(1) Retaliation for Whistleblowing under 42 U.S.C. § 1395(d)(d);

(2) Relief from Retaliatory Actions under 31 U.S.C. § 3730(h);

(3) Retaliation under Cal. Health & Safety Code § 1278.5;

---

[4] The MEC is the primary governance committee for the independent medical staff, which includes plaintiff. This committee, with input from the medical staff, makes key leadership decisions related to medical staff policies, procedures, and rules. Brar Dep. 27:4–25.

5

(4) Negligent interference with prospective business;

(5) Intentional interference with prospective business;

(6) Interference with contractual relationships;

(7) Settlement agreement violations; and

(8) California's unfair competition law violations.

Compl. ¶¶ 30–75. Defendant moves for summary judgment on all claims. Plaintiff opposes only as to claims three, four, five, seven and eight. At hearing, the court granted plaintiff one week to supplement his briefing with identification of cases resolving summary judgment when a plaintiff engaged in both protected activity and activity subject to an adverse employment action, such as the writing of the letters here. Plaintiff's counsel filed a supplement, but after the court's deadline, and briefed a different issue. *See* ECF No. 63. The court therefore will not consider it.

II. LEGAL STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The moving party bears the initial burden of showing the district court "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Then the burden shifts to the nonmovant to show "there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . .; or show [] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the nonmovant] must do more than simply show that there is some metaphysical doubt as to the material facts"). Also, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48.

|    |                                                                                              |
|----|----------------------------------------------------------------------------------------------|
| 1  | In deciding summary judgment motion, the court draws all inferences and views                |
| 2  | all evidence in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587-88. |
| 3  | "Where the record taken as a whole could not lead a rational trier of fact to find for the non- |
| 4  | moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of* |
| 5  | *Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).                                    |

III. EVIDENTIARY OBJECTIONS

Both parties object to each other's evidence. Plaintiff objects to defendant's exhibits, deposition testimony and declarations on hearsay and authentication grounds. *See* Pl.'s Obj., ECF No. 50-2 (lodging the same objection against all but three exhibits). Defendant objects to plaintiff's declarations as irrelevant, argumentative and conjecture-filled. *See* Def's Obj., ECF No. 56.

"[T]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (citation omitted). The court may evaluate evidence in an inadmissible form on a summary judgment motion if evidentiary objections could be cured at trial. *See Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119–20 (E.D. Cal. 2006). Courts are sometimes "much more lenient" with the nonmovant's evidence. *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

A. Plaintiff's Objections

The court overrules plaintiff's twenty-five blanket evidentiary objections as vague and premature. Specifically, the court overrules plaintiff's authentication and hearsay objections to all deposition testimony. Pl.'s Obj. Nos. 3, 11, 14, 16, 17, 24, 25. Defendant has authenticated each deposition[5] and appropriately cited deposition excerpts by line number. Plaintiff quibbles about a "missing" deponent's signature that is not required because the deponent did not change

---

[5] All of defendant's depositions were properly certified except for Plaintiff's Deposition, Vol. 2. Defendant explained this was an inadvertent clerical omission and filed the missing certification with its reply brief, without modifying the deposition's content. *See* Zim Decl., ECF No. 55-1.

7

her testimony. Fed. R. Civ. P. 30(e). Though defendant did not lodge the full deposition transcripts with the court by the briefing deadline as Local Rule 133(j) requires, plaintiff neither objects to any deposition on this basis nor raises any question as to the contextual honesty of the excerpts defendant cites. The court therefore does not reject the depositions on this basis. The court also overrules plaintiff's hearsay and authentication objections to his own letters, and the Committee's and the MEC's letters as well. *See* Pl.'s Obj. Nos. 9, 10, 12, 13, 15, 18, 19. Plaintiff's retaliation claim relies on those letters, as counsel conceded at hearing and the letters' authors either already have authenticated them or could at trial. *See* Pl.'s 1st and 2nd Letter; Committee's 1st and 2nd Letters; Susp. Letter. The court likewise overrules plaintiff's objection to the parties' settlement agreement. Pl.'s Obj. No. 8. When asked at hearing, plaintiff's counsel conceded he would withdraw any objections to documents plaintiff himself relies on. Plaintiff relies on this settlement agreement: He bases his seventh claim on this agreement, incorporates it into his complaint, and attaches it to his opposition. *See* Compl. ¶ 68; Opp'n at 16; Pl.'s Ex. A, ECF No. 50-10. Lastly, the court overrules plaintiff's objections to the hospital's billing, accounting and newborn allocation records as unauthenticated. *See* Pl.'s Objs. Nos. 21, 22, 23. Plaintiff's own deposition testimony authenticates the billing records,[6] plaintiff's accountant authenticates his accounting records at her deposition, and defendant's qualified data analyst authenticates the newborn patient allocation table. *See* Pl.'s Dep. vol. 2, 355:4–6 (explaining Accucode handles his patient billing); Shea Dep. 23:2–24:8 (authenticating income records); Rhoades Decl. ¶¶ 1–2 (authenticating patient allocation table).

      B.     Defendant's Objections

The court also overrules defendant's objections to plaintiff's declarations. *See generally* Def's Obj. (challenging plaintiff's declarations filed as attachments 3 to 10 in ECF No. 50). As noted, the standard for admissibility at this stage, especially for the nonmovant, is particularly lenient. *Scharf*, 597 F.2d at 1243. Defendant's objections that plaintiff's declarations

---

[6] Although the defense did not depose Accucode, the entity that provided plaintiff's billing records prior to summary judgment practice, defense counsel plans to call an authenticating Accucode witness at trial, which suffices. Def.'s Response at 8; *Burch*, 433 F. Supp. 2d at 1119.

contain irrelevant, argumentative statements based on "speculations, hunches, intuitions, or rumors about matters remote from [personal] experience," are premature and may be cured at trial. For example, defendant objects to the following as argumentative and lacking in foundation and personal knowledge: "On March 5, 2013, Defendant sent a letter to me . . . in what appeared to be a cover-up. This March 5, 2013 letter contains lies, is inconsistent and entirely unbelievable." Def.'s Obj. No. 23 (citing Pl.'s Decl. at 6:13–16, ECF No. 56-10). Focusing on content rather than form, the underlying fact that plaintiff received the letter and considers it unbelievable may be admissible at trial. In sum, the court overrules both parties' evidentiary objections in their entirety.

IV. DISCUSSION

    A.    <u>Retaliation: Cal. Health & Safety Code (Claim 3)</u>

Plaintiff opposes summary judgment only on one of his three retaliation claims; Retaliation under the California Health & Safety Code section 1278.5. Plaintiff alleges defendant retaliated against him by suspending him for a week after he voiced concerns about the hospital's patient handling. Compl. ¶¶ 41–45. The statute on which plaintiff relies provides that "[n]o health facility shall discriminate or retaliate in any manner against any . . . employee of the health facility because that . . . employee . . . has presented a grievance or complaint . . . relating to the care, services, or conditions of that facility." Cal. Health & Safety Code § 1278.5(b)(1). The state legislature intended section 1278.5 to encourage medical staff and patients to notify government entities of "suspected unsafe patient care and conditions[,]" and to protect whistleblowers from retaliation. *Id.* § 1278.5(a); *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1105 (9th Cir. 2008). The statutory protections "apply primarily to issues relating to the care, services, and conditions of a facility . . . " Cal. Health & Safety Code § 1278.5(a). There is "a rebuttable presumption [of retaliation] . . . if responsible staff at the facility or the entity that owns or operates the facility had knowledge of [the employee's grievance . . . and the discriminatory action occurs within 120 days of the filing of the grievance or complaint." *Id.* § 1278.5(d)(1).

9

Assessing retaliation claims involves a burden-shifting framework. First, the plaintiff must establish a prima facie retaliation case by showing (1) the employee engaged in statutorily protected activity; (2) the employee suffered an adverse employment action; and (3) a causal link between the two. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000); *see also* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) (establishing same framework for disparate treatment claims). If plaintiff meets this requirement, the burden shifts to the defendant employer to show legitimate reasons for its adverse action. *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000). If the employer carries this burden, plaintiff must then raise a genuine issue of material fact about whether the employer's non-discriminatory reason was pretextual in order to defeat summary judgment.

### 1. Prima Facie Case

Plaintiff here establishes a prima facie retaliation case. First, plaintiff's sending of his letters, though they were riddled with personal attacks, qualifies as "protected activity." Defendant contends the letters' fiery nature precludes this characterization, but argues this first in its reply, without citation to authority. Reply at 3. The court is unpersuaded. Plaintiff's letters mention his patient care concerns, and he sent copies to the hospital leadership. *See* Pl's 1st Letter (complaining about patient quality of care at the Hospital generally); Pl's 2nd Letter (specifically raising an "on-call coverage" issue). Defendant has not carried its burden to show plaintiff's decision to lard his care concerns with sensational personal attacks takes the letters outside the statute's protective ambit. Plaintiff's letters are protected activity.

The parties do not dispute that plaintiff satisfies the second and third elements of a prima facie case. A one-week suspension is unequivocally adverse employment action, and plaintiff enjoys a rebuttable presumption of causation because the hospital temporarily suspended him within 120 days of receiving his letters and specifically cited the letters as the basis. *See* Cal. Health & Safety Code § 1278.5(d)(1).

Because plaintiff has met his burden at this first step of the required analysis, the burden shifts to defendant to establish a non-retaliatory reason for the suspension.

1                  2. <u>Non-Retaliatory Reason</u>

Defendant has shown a non-retaliatory justification for plaintiff's suspension for the purposes of summary judgment. Defendant argues it suspended plaintiff based on his letters' outrageous language, accusations, and Code of Conduct violations, and not because of his patient care concerns. Mot. at 11. To support this argument, defendant points to plaintiff's deposition testimony and his letters, as well as the depositions of Committee and MEC members, and these committees' responses to plaintiff's letters. *See generally* Exhibits attached to Zim Decl.

On their face, large portions of plaintiff's letters are plainly inflammatory, accusatory, and inconsistent with the hospital's Code of Conduct. *See* Pl.'s 1st and 2nd Letters. No reasonable jury could find otherwise. The Committee's response recognized that the letters also raised care concerns and addressed these separately. The Committee's first letter, sent July 3, 2012, addressed only plaintiff's care concerns and advised him on how to properly report care concerns. Committee's 1st Letter (explaining plaintiff should direct care concerns to the Chair of the Practitioner Excellence Committee). The Committee's second letter, sent weeks later on July 23, 2012, warned plaintiff of potential consequences if plaintiff continued with his aggressive, Code-violating language, but did not administer discipline. *See* Committee's 1st and 2nd Letters. In response, plaintiff sent his second, lengthy inflammatory letter. It was only after this second letter that the Committee recommended suspension. The MEC's letter of suspension, explained by MEC members in their depositions, affirm plaintiff's language, not his patient care concerns, led to his suspension. *See* Brar Dep. 10:12-11:5 (explaining the MEC based plaintiff's suspension on his derogatory Code-violating letters that cast healthcare providers as "murderers."); Plass Dep. 72:5–17, 73:18–74:3 (plaintiff suspended because he twice violated Code of Conduct); Brouette Dep. 56:3–21, 57:13–23 (because series of letters and responses let plaintiff know this was a serious matter, week-long suspension, to be served whenever plaintiff chose, "was probably a reasonable choice and I supported it."). The suspension letter itself spells out these non-retaliatory reasons: "The destructive nature of [Dr. Ndulue's] letters, its [sic] outrageous language, [his] past history of sending such letters about colleagues and staff, and

11

1 [his] behavioral history." Susp. Letter. These letters, the MEC reasoned, violated the "hospital-wide Code of Conduct." *Id.*

Moreover, plaintiff admits he is bound by the hospital's Code of Conduct and that in his first letter he intended to attack a colleague's competence, which was an express Code of Conduct violation. Code § II.E.3; Pl.'s Dep. vol. 1, 219:7–11, 219:23–220:2. The Committee attached the Code of Conduct to its second letter response and simultaneously warned plaintiff that his language violated Code section II.E.3, prohibiting attacks on a colleague's competence. Committee's 2nd Letter. It cannot be disputed that plaintiff violated the Code of Conduct.

Together this evidence provides a coherent, non-retaliatory justification for defendant's decision: Defendant suspended plaintiff for one week because he used atrocious language that violated the hospital's Code of Conduct. This evidence rebuts the statutory presumption of unlawful retaliation. *See In re Quentin H.*, 230 Cal. App. 4th 608, 615 n.6 (2014) (rebuttable presumption of causation "disappears once contrary evidence is introduced"). Defendant has met its burden at the second step of the required analysis.

3. Pretext

The burden thus shifts back to plaintiff to show there is a genuine dispute regarding defendant's stated reason for his suspension is merely pretextual. *Brooks*, 229 F.3d at 928. Plaintiff falls short of this requirement.

Plaintiff labels defendant's evidence as "inconsistent" and "entirely unbelievable," Opp'n at 11, but such bald assertions are no match for defendant's detailed evidence.

Plaintiff also points to the short time span between the sending of his letters and his suspension as circumstantial proof of retaliation. Pl.'s Decl. ¶ 36 (suspension came 47 days after his second letter). But the short time span here is of limited relevance. In cases where the defendant bases the adverse employment decision on conduct distinct from the plaintiff's alleged protective activity, temporal proximity between the two is relevant. But here, the parties agree plaintiff's letters drove the suspension. They disagree regarding whether the basis for suspension was plaintiff's care concerns or his incendiary language and personal attacks. How soon

1  defendant suspended plaintiff after receiving his letters, and particularly the second letter, is
2  irrelevant to that particular query.

3  Plaintiff further argues his lone declaration establishes a material dispute as to
4  pretext. His declaration contains many unsupported opinions, as well as argument and
5  conjecture. *See generally* Pl.'s Decl. His factual representations are contradicted by the record.
6  For example, plaintiff states the hospital leadership's letters showed "no indication how [the
7  MEC] or [the Committee] concluded that [he] violated the Hospital's Code of Conduct . . . ." *Id.*
8  ¶ 20. Yet the Committee's letter explains that plaintiff's "inappropriate and unprofessional"
9  language violated the Code and attaches the section. *See* Committee's 2nd Letter (attached Code
10 § E(2), (3)).

11  Plaintiff also argues the MEC tried to bribe him to drop claims against the hospital
12 and then suspended him when he refused. Opp'n at 12–14. Plaintiff avers Dr. Brouette told him
13 "if [he] agreed to waive all claims against the Hospital, [his] suspension would be dropped" and
14 that "Dr. Yash Brar, Dr. Robert Plass, and Dr. Richard Brouette appeared to be upset at [his]
15 decision [not to agree]." Pl.'s Decl. ¶ 31. These scant admissions, if that is what they are, do not
16 show plaintiff's suspension was mere pretext. Plaintiff does not explain what claims he was
17 asked to drop, or how they related to his patient care concerns. His conclusory, self-serving
18 declaration, devoid of any support, cannot alone defeat summary judgment. *See Thornhill*
19 *Publishing Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979) (businessman's conclusory
20 statement that conduct affected commerce did not defeat summary judgment); *Falls Riverway*
21 *Realty, Inc. v. Niagara Falls*, 754 F.2d 49 (2nd Cir. 1985) (conclusory testimony insufficient
22 support for summary judgment).

23  Plaintiff additionally contends that defendant did not afford him proper process
24 before suspending him. Opp'n at 6. Plaintiff argues he was "not given actual notice of the
25 charges against him prior to the suspension and not given a chance to meaningfully respond" in
26 violation of the hospital bylaws. Opp'n at 10 (citing Fremont Rideout Medical Staff Bylaws
27 ("Bylaws"), Ex. N to Pl.'s Decl.). The bylaws plaintiff cites do not mandate a hearing. *See* Art.
28 VII ¶ 7.1-5. A hearing is required for a summary suspension of staff membership or privileges

13

only "if such suspension is required to be reported to the Medical Board of California." By Laws Art VII § 7.2(d). Here, nothing in the record indicates plaintiff's suspension was reported to the Medical Board of California. Defendant's conduct otherwise complied with the hospital bylaws. Formal investigations are not required; "The Chief of Staff may . . . resolve the issue informally, refer the matter to the MEC, or recommend a formal investigation." Art. VI. ¶ 6.3-3. Once the MEC receives a request, it "shall take action, which may include . . . suspension or reduction of Clinical Privileges . . . for a defined term." *Id.* ¶ 6.5(c).

Not only do the bylaws support defendant's suspension decision, but the nature of plaintiff's transgressions here also supports that decision. There were no facts to further investigate given that plaintiff's letters facially violated the Code of Conduct; plaintiff had engaged in at least one prior similar written outburst; and the Committee warned him after his first letter that there would be consequences for similar repeat conduct, yet he immediately responded with a longer, more inflammatory letter.

No reasonable juror could find defendant's suspension decision was a pretext for unlawful retaliation. The court GRANTS summary judgment for defendant on plaintiff's third claim.

B. <u>Interference with Prospective Business and Economic Relationships (Claims 4, 6)</u>

Defendant moves for summary judgment on plaintiff's fourth and sixth claims of negligent interference with prospective business and intentional interference with prospective business. Plaintiff alleges that from late 2011 to the date he filed his complaint on March 20, 2014, defendant directed multiple newborns to other pediatricians, even though the mothers specifically requested plaintiff. Compl. ¶¶ 23–24. This practice, plaintiff contends, affected his practice and reduced his income. *Id.*

Plaintiff's two business interference claims have the same following elements: (1) Plaintiff's prospective business relationship has a "probability of future economic benefit"; (2) defendant knew about the relationship; (3) defendant's actions either intentionally interfered with this business (sixth claim) or were substantially certain to interfere with it (fourth claim); (4) actual causation; and (5) defendant's conduct proximately caused plaintiff damages. *Korea*

14

1  *Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).  Both claims also require

2  that defendant's conduct was "independently wrongful," meaning wrongful "by some legal

3  measure, rather than merely a product of an improper, but lawful, purpose or motive."  *San Jose*

4  *Const., Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1544–45 (2007) (internal citations omitted);

5  *Della Penna v. Toyota, Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995).

6  Plaintiff alleges defendant "discouraged [patients] from selecting plaintiff as their physician or pressured them to switch their selection . . . ," which caused "a significant drop in his new patients' intake" and "negatively affect[ed] [his] ability to grow his practice."  Compl. ¶ 51. Yet the record contradicts plaintiff's claims.  Plaintiff's newborn patient statistics from 2010 through 2015 show no decline.  *See* Patient Allocation Table (showing the hospital assigned plaintiff 154 newborns in 2010, 243 in 2011, 254 in 2012, 280 in 2013, 317 in 2014, and 289 in 2015).  Plaintiff's billing records also show no decrease but rather that he billed patients more during this period than any other five-year interval during which he worked in this same hospital. *See* Pl.'s Billing Records (plaintiff billed the following amounts: $2,620,595.16 (2011); $2,399,546.65 (2012); $2,773,137.98 (2013); $4,006,647.72 (2014); and $4,784,246.87 (2015)); Pl.'s Dep. vol. 2, 355:4-6, 356:17–19 (authenticating billing record).  Plaintiff's income report also shows steady income from 2010 through 2015.  *See* Schedule C Income Report.  Defendant's internal new patient allocation table also shows plaintiff received a consistently equal percentage of newborns during these years.  *See* Patient Allocation Table.

In the face of this evidence, plaintiff has not raised a genuine issue of material fact as to his damages.  *Anderson*, 477 U.S. at 250.  Plaintiff's opposition cites his conclusory and unsupported declaration that "[he] reviewed [his] tax returns for 2007 to 2015 and financial statements for 2016 [and] . . . determined [he] suffered an estimated total reduction in earning to [his] practice of approximately $640,000.  [He] attribute[s] these losses to the patients [defendant] directed away from [him]."  Pl.'s Decl. ¶ 45.  Plaintiff also provides declarations from four new mothers, each claiming she wanted plaintiff as her physician, but defendant assigned her to a different pediatrician.  Menchaca Decl., ECF No. 50-5; Khan Decl., ECF No. 50-7; Barbain Decl., ECF No. 50-8; Alcantar Decl., ECF No. 50-9.  Plaintiff also points to a declaration from

Dr. Leonard Marks articulating his separate, personal grievance with the patient allocation system, Marks Decl., ECF No. 50-4. Lastly, plaintiff's office worker, Ms. Lillian Leos, avers certain patients' medical files from 2012 through 2014 contained no signed allocation forms and approximately half of the patients were sent to other pediatricians despite having requested plaintiff. Leos Decl. ¶ 20, ECF No. 50-6. While it is not the court's duty to comb the record of a case in resolving summary judgment, the court has located the declaration plaintiff filed from an accountant, Christopher Whitaker. The declaration, stating plaintiff's tax returns show a $640,000 dip in 2015 earnings, might support some kind of damages claim. *See* Ex. 1 to Whitaker Decl., ECF No. 50-3. Plaintiff does not explain the declaration's significance in his opposition, though he makes a reference to it. And plaintiff's counsel did not argue any conclusion from the declaration at hearing. The declaration itself contains no information that ties any 2015 tax loss to the patient diversions plaintiff alleged occurred from 2010 until he filed suit in March of 2014.

In sum, plaintiff's declarations neither introduce affirmative evidence of damages that defendant's alleged patient diversion caused nor rebut defendant's contrary showing. Plaintiff's self-proclaimed $640,000 loss is speculative at best, given its lack of documentary support. Defendant's authenticated documentary evidence rebuts plaintiff's claim. *See* Exs. T, U, V. As for the new mothers claiming they wanted plaintiff as their doctor but for the hospital's alternate assignment, that too is speculative. Lastly, because plaintiff does not explain or contextualize Whitaker's declaration, the declaration alone does not manufacture a factual dispute. It is plaintiff's burden to establish the nature and extent of his alleged damages as reasonably certain. *Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1457 (9th Cir. 1983). He has not met this burden.

Plaintiff also has not identified disputed material facts as to defendant's unlawful or wrongful acts in allocating newborn patients, which both claims four and six require. Plaintiff's evidence does not suggest that defendant tried to dissuade patients from defendant's practice, spoke ill of plaintiff, or engaged in any other remotely questionable conduct. Plaintiff's declarations at most show several patients asked for plaintiff but were sent elsewhere. *See, e.g.*,

1    Pl.'s Decl. ¶¶ 46, 47.  When he was asked whether he knew about misdirected patients, plaintiff

2    said no.  *See* Pl.'s Dep. vol. 1, 85:20–86:9, 94:25–95:19.  At hearing, plaintiff's counsel offered

3    no stronger evidence on these claims.

4             A reasonable juror could not find for plaintiff on the damages or wrongful conduct

5    elements on plaintiff's fourth and sixth claims.  The court GRANTS summary judgment for

6    defendant on these claims.

7         C.    Breach of Settlement Agreement (Claim 7)

8             Plaintiff's seventh claim alleges defendant's newborn patient diversion, as

9    discussed above, breached the parties' 2011 settlement agreement.  Plaintiff cites no authority to

10   support this claim and raises no genuine factual disputes over defendant's compliance.  The

11   relevant settlement agreement clause states:

12   > The parties agree the newborn allocation policy of the Fremont
     > Rideout Hospitals will be amended to reflect that Fremont Rideout
13   > Hospital Staff will make reasonable efforts to obtain from labor and
     > delivery patients their preferred pediatrician or whether they do not
14   > have a preferred pediatrician and will make reasonable efforts to
     > obtain the designation in the writing of the patient and signed by the
15   > patient, including after a medical emergency.

16   *See* Settlement Agreement ¶ F.

17            Defendant submits evidence that it changed its Pediatrician Allocation Policy as

18   the agreement requires.  *See* Krista Minton Dep. 23:12–16.  Since 2011 the hospital gives

19   laboring mothers a list of pediatricians to select from upon arrival, and nurses neither endorse nor

20   oppose any given pediatrician.  *See* Minton Dep. 23:12–16, 26:1–6, 33:19–22, 34:13–21; *see also*

21   Pediatrician Request Form.

22            Plaintiff does not meaningfully rebut this evidence.  As discussed above, plaintiff's

23   affirmative evidence on this point is limited to declarations of four New mothers, a fellow doctor,

24   and plaintiff's office worker.  *See* ECF No. 50.  Not one of these declarations identifies any way

25   in which defendant breached the settlement agreement.  The agreement does not define

26   "reasonable efforts" or require particular results beyond amending the policy, which defendant

27   did.  Dr. Marks opines that defendant violated the agreement: "I discovered that Fremont-Rideout

28   was not complying with the new born allocation policy according to the settlement agreement,

which also affected a number of my patients. I complained several times." Marks Decl. ¶¶ 11, 12. But his standalone legal conclusion is without foundation and insufficient to raise a genuine dispute. Plaintiff does not tie the blanket assertion of his assistant, Ms. Leos, that "[their] office has consistently had problems obtaining allocation designation forms," or her numeric breakdown of the problems, to the alleged settlement agreement violation. *See* Opp'n at 21; Leos Decl. ¶ 20. The four other declarants merely claim, in a few lines, that each wanted plaintiff as her physician, but defendant assigned her to a different pediatrician. Menchaca Decl.; Khan Decl.; Barbain Decl.; Alcantar Decl. But defendant did not agree to assign each mother to her requested pediatrician. Rather, defendant agreed to make reasonable efforts to obtain pediatrician requests in writing. No declaration says a mother tried to obtain a request form, or that the hospital refused to give her one, or say anything else that might reveal a failure to comply with the policy change agreed to in settlement.

In sum, plaintiff does not identify how defendant violated their agreement, he lacks affirmative evidence that defendant or its agents directed patients away from plaintiff, and he admits he does not personally know if any misdirection actually occurred. No reasonable jury would find that defendant breached the settlement agreement. The court GRANTS summary judgment for defendant on plaintiff's seventh claim.

D.   Unfair Competition (Claim 8)

Plaintiff contends defendant's decisions to suspend him, divert his patients, and breach their 2011 settlement agreement all constitute unfair business practices under California law. Compl. ¶¶ 70-75; Opp'n at 17.

A claim under California Business and Professions Code section 17200 (the "UCL") requires that the defendant's conduct was "unlawful," "fraudulent," or "unfair." *See*, *e.g.*, *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007). This law targets misleading business practices that deceive the public or threaten competition. *Farmers Ins. Exchange v. Superior Ct.*, 2 Cal. 4th 377, 383 (1992); *Morgan v. AT&T Wireless Serv., Inc.*, 177 Cal. App. 4th 1235, 1254 (2009); *Cel-Tech Commc'n, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).

Plaintiff does not allege explain, or prove how defendant's alleged conduct fits within the unfair competition law.  At hearing, plaintiff's counsel restricted the UCL claim to the "unlawful" prong, yet plaintiff has not and did not at hearing explain on what unlawful acts the claim is predicated.  *See Maystruk v. Infinity Ins. Co*., 175 Cal. App. 4th 881 (2009) ("unlawful" prong requires proof defendant's conduct plausibly violated some law other than § 17200).  The court GRANTS summary judgment for defendant on plaintiff's eighth claim.

### E. <u>Plaintiff's Non-Opposition to Summary Judgment on Three Claims (Claims 1, 2, 5)</u>

Plaintiff does not oppose summary judgment on claims one (retaliation under 42 U.S.C. § 1395), two (retaliation under 31 U.S.C. § 3730(h)), and five (tortious interference with contract).  Opp'n at 6.  The Ninth Circuit deems it an error to grant summary judgment purely because the nonmovant does not oppose.  *See In re Rogstad*, 126 F.3d 1224, 1227 (9th Cir. 1997) ("The party opposing the motion is under no obligation to offer affidavits or any other materials in support of its opposition . . . ."); *Hoover v. Switlik Parachute Co*., 663 F.2d 964, 967 (9th Cir. 1981) (explaining court should not grant summary judgment where movant's evidence is lacking just because there was no opposition).  Here, when the court probed at hearing, plaintiff affirmatively relinquished these three claims.

The court GRANTS summary judgment for defendant on plaintiff's first, second, and fifth claims.

### V. <u>CONCLUSION</u>

The court GRANTS defendant's motion for summary judgment in full.

IT IS SO ORDERED.

This order resolves ECF No. 41.

DATED: June 12, 2017.

UNITED STATES DISTRICT JUDGE